## PENN PLASTERING CORPORATION *v.* O'BOYLE, ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON, ET AL.

[No. 280, September Term, 1968.]

*Decided June 2, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Gerald E. Topper* for the appellant.

*Thomas B. Yewell* for appellee Most Reverend Patrick A. O'Boyle, Roman Catholic Archbishop of Washington, *Edward Gallagher,* with whom was *Richard H. Love* on the brief, for appellee Glens Falls Insurance Company.

HAMMOND, C. J., delivered the opinion of the Court.

Penn Plastering Corporation, a plastering subcontractor, sued Three Crowns Enterprises, Inc., the prime contractor for the building of the Villa Rosa rest home in Mitchellville, and because it would be judgment-proof, also sued the surety, Glens Falls Insurance Company, in the same suit on its bond covering performance and payment of labor and material claims and the owner, obligee under the bond, the Most Reverend Patrick A. O'Boyle, Archbishop of Washington, a corporation sole, on the claim that it had independently promised payment if Penn completed its subcontract. At the end of the plaintiff's case, Judge Parker, sitting without a jury, gave judgment for Penn against Three Crowns "inasmuch as it has been in default * * * and the proof indicates there was $10,000 due," but found for the Archbishop because "there has been a complete failure of proof that there was any contact [or contract] with him," and for Glens Falls "there has just been a lack of proof * * * that the corporate entity [known as Penn Plastering Corporation] existed at the time of suit" and a lack of proof of the details of the plans and specifications and the extent of Penn's performance in accordance with them.

We agree that there was no legally sufficient proof of an independent promise by the Archbishop but we find

that there was proper proof of performance by Penn sufficient to entitle it to the same judgment against Glens Falls, the surety on the bond, as was rendered against Three Crowns, the principal.

Glens Falls says in its brief that the main question presented is whether "in a case where recovery is sought on the basis of a building subcontract the plans, specifications, and the prime contract, are essential elements of the proof" and that a subsidiary question presented is whether a corporate plaintiff may maintain a suit where "it appears the corporation has been liquidated, and is no longer in existence; especially where there is no proof that it was ever licensed to do business in Maryland," and a second subsidiary question whether secondary evidence and records kept in the regular course of business should have been received and used as proof. There was not below and there is not before us any contention that the bond does not cover Penn, that Penn could not sue Glens Falls directly, or that notice and filing of suit were not timely.

We treat the first subsidiary question as a threshold matter and deal with it first. Glens Falls' somewhat casual suggestion in the course of the trial that Penn had not proven it was a viable corporate entity when suit was filed, must die aborning. Maryland Rule 342 c 1 (i) provides that the defense of a denial of the incorporation of the corporation must be specially pleaded. Rule 311 provides that: "Whenever * * * the incorporation of any alleged corporation * * * is alleged in the pleadings in any action, such fact shall be deemed to be admitted in so far as such action is concerned, unless it shall be denied by the next succeeding pleading of the opposite party to the merits." Penn alleged in its declaration against Glens Falls that Penn was "a body corporate, duly qualified to do business in the State of Maryland." Glens Falls filed the general issue plea, and therefore admitted as a fact for the purposes of the case the full incorporation of Penn in Maryland. There was no testimony that Penn had not continued as an existing corporation, merely that it was

selling its equipment, collecting the debts due it and paying its bills. Judge Parker should not have relied on the ground that Penn had not proved itself to be a corporate entity in ruling in favor of Glens Falls.

The main question and the second subsidiary question can be discussed together. From the very beginning until the end, the trial judge indicated that the only proof that would convince him of Penn's right to recover against the surety would be that based on the plans and specifications being in evidence. Penn's witnesses testified that the firm was being liquidated because of the long illness and consequent death of one of its owners and the retirement of another, and that the copies of the plans and specifications it had been furnished had not been found; and although the court said "apparently they are missing," he attempted not to allow secondary evidence. Nevertheless, considerable probative secondary evidence came in without objection, as did the contract under which Penn agreed to do the plastering and dry wall work for $33,000.00.[1] Also much secondary probative evidence

---

1. The contract provided that:
   "The Subcontractor will furnish all supervision, labor, materials, and equipment as described hereafter for: Plastering and drywall requirements complete according to plans, specifications and the attached list of specific inclusions. Wood furring, metal furring, steel stud partitions and setting of door frames are specifically included. In the absence of any specification requirement to the contrary, all work shall be performed to owners satisfaction and in accordance with all applicable local codes. Scratch coat or drywall to receive ceramic tile is included.
   "The Builder agrees to pay the Subcontractor for the performance of his work the sum of Thirty Three Thousand and 00/100 ($33,000.00) Dollars, in current funds, subject to additions and deductions for changes as may be agreed upon, and to make payments on account thereof in accordance with Article IX." [part of Article II]
   "Monthly payments will be made on or about the 10th of each month based on ninety (90%) of the value of the work accomplished up to and including the 20th of the preceding month, computed in accordance with a partial payment breakdown to be submitted by the Contractor to the Owner for approval prior to submission of the first requisition by the Contractor. All requisitions for payment must be accompanied by a Contractor's Check List, signed by the Owner, Builder, and/or General Contractor's representative on the job." [part of Article IX]

was allowed against Three Crowns only, which we think was admissible against the other defendants.

The principal witness for Penn was Mitchell Laiken, now otherwise employed, who had served as its accountant-comptroller for the five years preceding its decision no longer to accept contracts. His regular duties had included the figuring of the costs of all of Penn's jobs, the checking of all estimates of its work and the checking of the work in the field to see that it was properly completed. His college courses had included three years of estimating and he knew "exactly how much work was done by our company." He checked the estimates on the Villa Rosa job which Penn's engineers had prepared, "checked the mathematics and went over it with the engineers to see that the job was taken off [the plans and specifications] correctly." Penn had been furnished those plans and specifications and he went over them. There was a set on the job site and when he went there, which he did as often as once a week, to see how much work had been done, he would check the work done against the plans and specifications. He did this with an estimator or an engineer, "and we would take off the exact amount of work done so we would know how the job was progressing." Judge Parker ruled that Mr. Laiken could testify as to how much work Penn had done if he had personal knowledge thereof. In response, the witness said he did have personal knowledge and that "ninety per cent of the work was completed." He said: "I went through the building from top to bottom. I examined every piece of work that was done," and when asked whether this was in comparison with the plans and specifications, he replied, "Absolutely." He said he could say from his own knowledge and from Penn's records kept in the regular course of business the exact amount of money Penn was entitled to be paid for work done at Villa Rosa under the contract and according to the plans and specifications but the court would not allow him to set a figure. He was allowed to testify as to the monthly statements of the money due for work done that he had prepared and sent to

Three Crowns. He never received any complaint or claim of inaccuracy, although he would have been the person who would have. Counsel for the Archbishop and Glens Falls agreed the statements would be admissible against Three Crowns but objected to their admission against the Archbishop and Glens Falls, and Judge Parker refused to admit them except as against Three Crowns.

They appear in the record as "Agreed Exhibit No. 5" (the contract which came in without objection against all three defendants appears as "Agreed Exhibit No. 1"). The first item in Exhibit No. 5 is a letter of June 23, 1965, from Penn to Three Crowns, in which it is said:

"The following is our breakdown for purpose of billing on the above mentioned job.

| | |
|---|---|
| Dry Wall Material | $12,000.00 |
| Lath & Plaster Material | 2,000.00 |
| Dry Wall Labor | 14,000.00 |
| Lath & Plaster Labor | 5,000.00 |
| Contract | $33,000.00" |

The second is an invoice of the same date as follows:

"For work completed to date on above mentioned subject according to attached breakdown.

| | | | |
|---|---|---|---|
| Dry Wall Material | 40% of | $12,000.00 | $4,800.00 |
| Plaster Material | 20% of | 2,000.00 | 400.00 |
| Dry Wall Labor | 25% of | 14,000.00 | 3,500.00 |
| Lath & Plaster Labor | 10% of | 5,000.00 | 500.00 |
| | | | $9,200.00 |
| Less 10% Retainer | | | 920.00 |
| | | | $8,280.00" |

A subsequent item is a bill dated July 20 for 80% of dry wall material, 95% of plaster material, 50% of dry wall labor, and 95% of lath and plaster labor, less 10% retained, plus an extra of $150, or a total of $21,075.00.

Against this was credited receipt of the $8,280.00 billed on June 23. The final item is a letter of January 26, 1966:

"Contract Price Complete    $33,000.00
Extra No. 1                      150.00
                              33,150.00
Received on Account           20,280.00
Balance of Contract           12,870.00
Work Completed to date 90% ...................   11,430.00
Amount of work to complete contract ........    1,440.00
For materials pilfered and ruined due to
   job being stopped  ...................................    4,790.50
Equipment and scaffolding missing . ..........    2,650.00
   We certify that this is a true and correct bill for work performed to date on the above mentioned project."

Samuel Gerson, a builder of large structures in various parts of the country over a period of twenty years, testified that after one of the owners of Penn died and another had retired, an officer of Penn asked him in the early part of 1965 to help Penn complete several jobs in the Washington area, including the Villa Rosa job on which work had stopped due to the financial straits of Three Crowns. The superintendent-watchman on the site turned over to him plans and specifications which he said were those for the Villa Rosa job, and Mr. Gerson said that after being asked to do so by a Monsignor he took to be the Archbishop who promised payment, he supervised the completion "to be conservative" of ninety per cent of the work called for by those plans and specifications.

Mr. Laiken's further testimony was that work on the Villa Rosa job stopped in November or December of 1965 (because Three Crowns went broke) and Mr. Gerson "who was the boss on the job at the time" told him the Archbishop had asked Penn to continue and finish the plastering and said that if it did, it "would get paid every cent coming to us." Penn did continue, said Mr. Laiken, and added:

"I sent men from Philadelphia Saturday and

Sunday and paid time and a half and paid hotels and meals to go down and finish the job * * *. I was down there many week-ends * * *. We did work three and four times. It was ripped out and we put in just to get out of there * * * we did everything humanly possible to push this job and do our work * * * we did practically everything our contract stated except where the plumbers and electricians told us to leave work open so they could get their pipes and wiring in. When they would do that, we could come back to complete the job * * * on a 100 per cent basis."

He testified also that Penn spent much more than the contract price called for but billed only for 90% of the $33,-000 contract price because that figure was the limit under its contract. Answering on cross-examination, he said: "We were obligated to complete the contract * * * this job was a tragic thing from the day it started * * * there was no management. * * * if you want me to I will go back and bill you for additional work we did, which we never billed you for."

Penn called as a hostile witness, Mr. Viner, the contractor the Archbishop hired to complete the job when Three Crowns finally flopped completely. He testified that when he went on the job he observed that Penn had completed what had been done "basically in accordance with the plans and specs [that he had seen with the contract]" and had been given by the architects. The plastering (the expensive part of the job, Judge Parker observed) was 90% complete and the dry wall work 50% complete. On cross-examination the witness said that in his opinion Penn had been overpaid for the amount of work that had been done.

Judge Parker obviously disagreed with this conclusion for he gave judgment for Penn against Three Crowns for $10,000, the sum to which, he found from the evidence, Penn was entitled for work it had done. We agree that

Penn was entitled to at least this amount and that the testimony of Mr. Laiken that came in without objection and his testimony properly admitted against Three Crowns, which flowed from the combination of his personal knowledge and the figures revealed by Penn's records kept in the regular course of its business, had probative value as to the amount of the liability of Glens Falls and should have been admitted against it. This testimony, buttressed as it was by that of Mr. Gerson and indeed of the hostile witness, Mr. Viner, should have induced the trial judge to enter the same judgment against Glens Falls he did against Three Crowns. Since it is apparent from the contentions of Glens Falls below and in this Court that it seeks to avoid liability on the weaknesses it claims for Penn's case and not on any available strength of its own case, above that offered it by the conclusion of Mr. Viner which Judge Parker rejected, we shall enter judgment for Penn under Maryland Rule 875 a rather than remand the case.

> *Judgment in favor of the Most Reverend Patrick A. O'Boyle affirmed, with costs; judgment in favor of Glens Falls Insurance Company reversed; and judgment entered against Glens Falls Insurance Company as of August 1, 1968 in favor of Penn Plastering Corporation for $10,000, costs to be paid by Glens Falls Insurance Company.*